739 P.2d 319

**Robert N. CAHALA, Claimant-appellant,**

**v.**

**OK TIRE STORE, Employer,**

**and**

**United Pacific Insurance Company, Surety, Defendants-respondents.**

**No. 16608.**

Supreme Court of Idaho.

May 15, 1987.

Robert L. Jackson, of Goicoechea Law Office, Pocatello, for claimant-appellant.

Thomas V. Munson, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents.

BAKES, Justice.

This claim for worker's compensation resulted from an altercation between two employees of the OK Tire Store in Jerome, Idaho. During the fight the appellant Robert N. Cahala (Cahala) broke his leg. Cahala's subsequent claim for benefits was denied by the employer. A hearing was requested before the Industrial Commission which heard the matter on March 11, 1986, and subsequently denied the claim. Cahala appeals the Industrial Commission's decision, claiming that the commission erred in its application of Idaho law. We disagree and affirm the Industrial Commission.

Cahala was the only witness to testify at the Industrial Commission hearing. He testified that during his employment at OK Tire another OK Tire employee named Kemp had continuously harassed him verbally over the years. The verbal attacks included Kemp's use of extremely offensive epithets. Cahala related that this situation was aggravated when Cahala pleaded guilty to the felony crime of lewd and lascivious conduct with a minor child. Four days after judgment was entered on August 10, 1984, Kemp again called Cahala several offensive names, including a child-molester, in front of two female customers. Cahala complained to the management, as he had previously done, but no action was taken. Thereafter, following another verbal incident, Cahala raised the level of confrontation from verbal to physical by taking a swing at Kemp who was kneeling down at the time. Cahala stated that he intended to frighten Kemp, but admitted that his action was sufficient to justify Kemp's belief that Cahala meant to hit him. Kemp grabbed the claimant about the waist, they struggled and fell over a floor jack, breaking Cahala's leg. On July 31, 1986, the commission entered its findings of fact and conclusions of law, holding that the injury did not arise out of and in the course of Cahala's employment because the cause of the altercation was wholly disconnected with Cahala's employment or his employer's business.

"Our review of the decisions of the Industrial Commission is limited to questions of law and to determination [of] whether the commission's findings are supported by substantial and competent evidence." *Parker v. St. Maries Plywood*, 101 Idaho 415, 419, 614 P.2d 955, 959 (1980), *citing* Id. Const. Art. 5, § 9; *Booth v. City of Burley*, 99 Idaho 229, 580 P.2d 75 (1978).

On appeal both parties agreed that *Mayo v. Safeway Stores, Inc.*, 93 Idaho 161, 457 P.2d 400 (1969), is the controlling law in Idaho where an employee's injury was the result of an altercation at the workplace. *Mayo* divided assault cases into three classifications:

"First, there are those assaults which are inherently related to the employment, such as assaults arising out of work disputes, and which generally result in award of compensation. Second, there are those assaults which are inherently personal and private in origin, which assaults arise from disputes imported by the employee from outside the sphere of employment, the only connection with the employment being the location at which the assault occurs. This class of assaults is generally considered as being noncompensable. The third classification by Larson is the 'neutral' assaults, wherein the cause of the assault can neither be assigned to the employment nor to the personal disputes with the employee." *Id.* at 163, 457 P.2d at 402, *citing* 1 Larson, Workmen's Compensation Law, § 11.31, p. 184 (1968).

The commission found that "the evidence explains the assault and the injury as having arisen from the personal animosity between the claimant and his co-worker." As a result, the commission found that the altercation was derived from a dispute that was "inherently personal or private in origin and was not compensable." Cahala argues that as a matter of law the facts produced at the Industrial Commission

hearing fell into the third or "neutral" category and are therefore compensable.

The commission was correct in applying the law as outlined in *Mayo v. Safeway, supra.* *Mayo* is the controlling authority in this state, as both parties admit.

There is substantial competent evidence in the record to support the commission's findings of fact. There was evidence that the assault that led to Cahala's injury was precipitated by the personal animosity between Cahala and Kemp which was not related to the workplace. Cahala admitted that he swung his fist with the intention of scaring Kemp. Cahala's intention to scare Kemp must have been accompanied by the knowledge that such action could precipitate a fight, thereby escalating the personal animosity from a verbal dispute into a physical altercation. While the evidence might have been subject to another interpretation by the factfinder, the commission's ultimate finding that the assault and injury was the result of a dispute that was "inherently personal and private" is supported by the record. *Parker v. St. Maries Plywood,* 101 Idaho 415, 420, 614 P.2d 955, 960 (1980) ("Although we might conclude otherwise if we were the finder of fact in this case, there is evidence to sustain the commission's findings and they are affirmed.").

Accordingly, the order of the commission is affirmed. Costs to respondent.

SHEPARD, C.J., and DONALDSON and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

Yet again the majority would affirm an unsupported decision of the Industrial Commission. The Commission's denial of benefits is based upon the finding that the assault and injury of Cahala arose from a dispute that was inherently personal or private in origin and noncompensable.

The Court in *Mayo v. Safeway Stores, Inc.,* 93 Idaho 161, 457 P.2d 400 (1969), set out three classifications for assault cases. First, those inherently related to employment arising out of work disputes; second, those inherently personal in origin where the assaults arise from disputes imported by the employee from outside the sphere of employment; and third, those neutral assaults where the cause of the assault cannot be assigned to the employment or the personal disputes of the employee. The Industrial Commission, as previously mentioned, placed Cahala's assault within the second classification. The findings of the Industrial Commission included (1) that "in the present case the evidence does not establish that the personal animosity between claimant and Kemp has any causal connection with the employment," R., p. 12, (2) that the evidence explains the assault and injury as having arisen from the personal animosity between the claimant and his co-worker, (3) it therefore does not arise out of and in the course of the claimant's employment. At best this is simply conclusory logic.

What was the evidence before the Industrial Commission? It consisted of a hearing before the Commission and the testimony of Robert Cahala. There was no evidence to show that any harassment occurred outside the times when Cahala was at work. Yet, the Commission concludes that the assault arose from a dispute outside the course of Cahala's employment and was not causally connected with his employment.

There is no finding of what the cause of the dispute was, merely a conclusion that there exists what the Commission calls, first, in its findings of facts "animosity" between Cahala and Kemp, and later in its conclusions of law "personal animosity" between Cahala and Kemp. R., p. 1012. The testimony showed that a problematic relationship with Kemp had existed for approximately six years. Tr., p. 6. It was described by Cahala as a problem where Kemp "was always agitating me and calling me names." Tr., p. 7. The Commission made no finding as to why this animosity had suddenly become personal and was disconnected from the employer's business. The Commission merely turned to the rulings in *Duerock v. Acarregui,* 87 Idaho 24, 390 P.2d 55 (1964), and *Devlin v. Ennis,* 77 Idaho 342, 292 P.2d 469 (1956). Both of these cases involved scenarios distinct from

Cahala's. *Duerock* was a shooting incident between a husband and wife acting as motel managers. The assault in *Devlin* arose because of the mutual relations between an employer and employer and a third party. What is common here is that the events precipitating the assault arose from nonemployment relationships, *e.g.*, domestic, sexual. These types of relations are distinct from Cahala's relation with Kemp which was comprised entirely of contacts occurring at their place of work.

The classification under *Mayo* attempts to separate those assaults arising from matters directly connected to employment and those arising outside the sphere of employment. The difficulty, however, is that no showing of any outside dispute exists. The only evidence consists of testimony of repeated verbal attacks on Cahala. The only aspect of the dispute which the record yields that the Commission could describe as outside the employment sphere would be the change in the tenor of Kemp's attacks following Cahala's guilty plea to the charge of lewd and lascivious conduct, where Kemp added the term of child molestor to his repertoire of "offensive epitaphs."

While this recent escalation resulted in the injury-causing altercation, there is no finding by the Industrial Commission that it constituted a personal or private dispute outside the scope of Cahala's employment. If the Commission is terming this the personal or private dispute, it is a very narrow drawing for purposes of the *Mayo* classification. This would eliminate any matters not directly tied to the acts for which the individual was employed. This is not what *Duerock* and *Devlin* meant by nonemployment related. Kemp's only relation with Cahala was within the confines of their employment. The employment relationship includes those aspects of the individuals employer:

> Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional make-up. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up. *Hartford Accident & Indemnity Co. v. Cardillo*, 112 F.2d 11 (D.C. Cir.1940).

In the case of Kemp, his personal qualities included an abrasive and agitating personality. Tr., p. 7. Contending with this individual was for Cahala part of the overall working environment and relationship. Just because Kemp fueled his attacks with material from Cahala's nonwork life does not make his dispute personal or nonemployment related. For instance, supposing Kemp's vituperative attacks against Cahala were solely predicated upon Kemp's distaste for Cahala's choice of religion? Or, were just out of shear meanness and the proclivities of a bully? The entire sequence of events arose out of the fact that the work of Cahala and Kemp brought them together in a working environment where Cahala's only avenue of escape was to surrender his employment, *i.e.*, give up his right to earn a living.

The Commission failed to find the cause of the dispute. In turn, without having established the cause of the dispute, the Commission cannot properly say that the assault was personal, and thus outside the sphere of employment. Only by so having positioned itself was the Commission able to say that the dispute was not within the employment. The testimony as to the nature of Cahala and Kemp's relationship provides greater weight to the contrary. Without a finding of the cause of the dispute, this case more appropriately fits into the third or neutral category where the cause of the assault is neither assigned to the employment nor to the personal disputes.

Under *Mayo*, with this third classification, when an injury occurs on the employer's premises, a presumption arises that the injury arose out of and in the course of employment. Idaho has adopted what is called the positional risk rule. *See Louie v. Bamboo Gardens*, 67 Idaho 469, 185 P.2d 712 (1947); *Foust v. Birds Eye Division of*

*General Foods Corp.,* 91 Idaho 418, 422 P.2d 616 (1967). When an injury results from an unexplained assault which occurs on the employer's premises and in the course of employment, a rebuttable presumption arises that the injury arose out of the employment and is compensable. It is clear here that *the assault occurred on the employer's premises and was in the course of employment,* that is, both Kemp and Cahala were presently employed and working at the time the altercation or assault occurred. The record yields no evidence which shows the employer has rebutted the burden under the positional risk rule.

An additional argument for granting compensation exists under the friction and strain rule from *Hartford, supra,* which holds that an assault is compensable if the work of the participants brought them together and created the relations and conditions which resulted in the assault. This argument is based upon the premise that work places individuals under strains and fatigue from human and mechanical impacts creating frictions which explode as the culmination of the pressures. The Commission concluded that the rule in *Hartford* did not apply here because the assault was the result of a "long-standing animosity aggravated by the claimant's conviction for lewd and lascivious conduct which led to further agitation by the claimant's co-worker." The Commission then did not find a sufficient connection between the injury and the employment conditions. The testimony at the hearing and the Commission's own findings of fact yield a different answer. The Commission's findings of fact note that during the six-year period of harassment, Cahala complained to both the foreman and the job supervisor on several occasions about Kemp's conduct. Tr., pp. 7–9, 11. Cahala also complained to the supervisor on the date of the assault. Tr., p. 8. No action was taken by the supervisor or the foreman in an attempt to alleviate or reduce Kemp's repeated provocations. That abuse, combined with the management's failure to act, certainly created a situation of friction. Cahala's testimony paints a picture of a management

contentedly unconcerned with a mean employee bullying another employee. The environment was ripe for an incident such as the one that occurred:

No worker is immune to these pressures and impacts upon temperament. They accumulate and explode over incidents trivial and important, personal and official. But the explosion point is merely the culmination of the antecedent pressures. That it is not relevant to the immediate task, involves a lapse from duty, or contains an element of volition or illegality does not disconnect it from them nor nullify their causal effect in producing its injurious consequences. *Hartford, supra,* 112 F.2d at 17.

The surprising thing here was the length of time it took for the assault to occur.

For the above reasons, the Industrial Commission decision should not be affirmed.